## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

AURORA LUJAN,

        **Plaintiff,**

v.                                   **No. CIV-15-200 LAM**

CAROLYN W. COLVIN, Acting Commissioner
of the Social Security Administration,

        **Defendant.**

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** is before the Court on Plaintiff's ***Motion to Reverse and Remand for a Rehearing with Supportive Memorandum*** (*Doc. 21*), filed August 21, 2015 (hereinafter "motion"). On November 19, 2015, Defendant filed a response to Plaintiff's motion (*Doc. 25*), and, on December 4, 2015, Defendant filed a reply (*Doc. 26*). In accordance with 28 U.S.C. § 636(c)(1) and Fed. R. Civ. P. 73(b), the parties have consented to the undersigned United States Magistrate Judge to conduct all proceedings and enter a final judgment in this case. *See* [*Docs.* 4 and 8]. The Court has considered Plaintiff's motion, Defendant's response, Plaintiff's reply, and the relevant law. Additionally, the Court has meticulously reviewed and considered the entire administrative record. [*Doc. 15*]. For the reasons set forth below, the Court **FINDS** that Plaintiff's motion should be **GRANTED** and the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") should be **REMANDED**.

# I.   Procedural History

On January 26, 2011, Plaintiff filed applications for Disability Insurance Benefits (hereinafter "DIB") and Supplemental Security Income (hereinafter "SSI"), alleging that she became disabled on November 1, 2005.[1]   [*Doc. 15-8* at 2-3 and 9-14, respectively].   Plaintiff claimed that she became disabled due to bipolar disorder and post-traumatic stress disorder (hereinafter "PTSD").[2]   [*Doc. 15-9* at 22].   Each application was denied at the initial level on March 31, 2011 (*Doc. 15-5* at 2, 4), and at the reconsideration level on June 7, 2011 (*id.* at 5, 7). Pursuant to Plaintiff's request (*Doc. 15-6* at 18-19), Administrative Law Judge Michelle K. Lindsay (hereinafter "ALJ") conducted a hearing on February 21, 2013.   [*Doc. 15-4* at 18-54]. At the hearing, Plaintiff was present, represented by attorney Rhonda Carroll, and testified.   *Id.* at 25-43, 46-49.   Plaintiff's sister, Loretta Lujan, also testified (*id.* at 44-45), as did Vocational Expert (hereinafter "VE") Thomas Greiner (*id.* at 46-53).

On August 16, 2013, the ALJ issued her decision, finding that, under the relevant sections of the Social Security Act, Plaintiff was not disabled through the date of the decision.   [*Doc. 15-4* at 5-17].   Plaintiff requested that the Appeals Council review the ALJ's decision.   [*Doc. 15-3*

---

[1] Plaintiff amended her alleged onset date to May 30, 2008 at the hearing before the ALJ.   *See* [*Doc. 15-4* at 23].

[2] Plaintiff also claimed disability based on a right foot fracture, as well as right wrist pain from carpal tunnel syndrome.   [*Doc. 15-4* at 24].   However, the ALJ found that those conditions caused "only a slight abnormality that would have no more than a minimal effect on her ability to work."   *Id.* at 7.   Because Plaintiff did not argue on appeal that this finding was erroneous, that issue has been waived and will not be considered in this decision.   *See, e.g., Gaines-Tabb v. ICI Explosives, USA, Inc*., 160 F.3d 613, 624 (10th Cir. 1998) (arguments not raised in opening brief are waived).

at 42-43].   By order dated January 5, 2015, the Appeals Council accepted additional evidence, Exhibits 15E (*Doc. 15-10* at 15-20), 16E (*Doc. 15-11* at 2-44), and 15F (*Doc. 15-20* at 2-13), which thereby became part of the record.   *Id*. at 7.   Also on January 5, 2015, the Appeals Council denied Plaintiff's request for review, on the ground that there was "no reason under our rules to review the [ALJ]'s decision."   *Id*. at 3-6.   This decision was the final decision of the Commissioner.   On March 9, 2015, Plaintiff filed her complaint in this case.   [*Doc. 1*].

## II.   Standard of Review

The standard of review in a Social Security appeal is whether the Commissioner's final decision is supported by substantial evidence and whether the correct legal standards were applied. *Maes v. Astrue*,   522 F.3d 1093, 1096   (10th Cir. 2008)   (citing   *Hamilton v. Sec'y of Health & Human Servs.*,   961 F.2d 1495, 1497–98   (10th Cir. 1992)).   If substantial evidence supports the ALJ's findings and the correct legal standards were applied, the Commissioner's decision stands, and the plaintiff is not entitled to relief.   *See Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004); *Doyal v. Barnhart*, 331 F.3d 758, 760 (10th Cir. 2003).   Courts should meticulously review the entire record but should neither re-weigh the evidence nor substitute its judgment for that of the Commissioner.   *Hamlin*, 365 F.3d at 1214; *Langley*, 373 F.3d at 1118.

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."   *Langley*, 373 F.3d at 1118 (citation and quotation marks omitted); *Hamlin*, 365 F.3d at 1214 (citation and quotation marks omitted); *Doyal*, 331 F.3d at 760 (citation and quotation marks omitted).   An ALJ's decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of

evidence supporting it."   *Langley*, 373 F.3d at 1118 (citation and quotation marks omitted); *Hamlin*, 365 F.3d at 1214 (citation and quotation marks omitted).   While a court may not re-weigh the evidence or try the issues *de novo*, its examination of the record as a whole must include "anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met."   *Grogan v. Barnhart*, 399 F.3d 1257, 1262 (10th Cir. 2005) (citations omitted).   "The possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ]'s findings from being supported by substantial evidence."   *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (citing *Zoltanski v. F.A.A.*, 372 F.3d 1195, 1200 (10th Cir. 2004)).

## III. Applicable Law and Sequential Evaluation Process

For purposes of DIB and SSI, a person establishes a disability when he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."   42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. §§ 405.1505(a), 416.905(a).   In light of this definition for disability, a five-step sequential evaluation process (hereinafter "SEP") has been established for evaluating a disability claim.   20 C.F.R. §§ 404.1520, 416.920; *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). At the first four steps of the SEP, the claimant has the burden to show that: (1) the claimant is not engaged in "substantial gainful activity;" and (2) the claimant has a "severe medically determinable . . . impairment . . . or a combination of impairments" that has lasted or is expected to last for at least one year; and either (3) the claimant's impairment(s) either meet(s) or equal(s) one of the "Listings" of presumptively disabling impairments; or (4) the claimant is unable to perform

his "past relevant work."     20 C.F.R. §§ 404.1520(a)(4)(i–iv), 416.920(a)(4)(i–iv);   *Grogan*, 399 F.3d at 1261.   At the fifth step of the evaluation process, the burden of proof shifts to the Commissioner to show that the claimant is able to perform other work in the national economy, considering his residual functional capacity (hereinafter "RFC"), age, education, and work experience.   *Grogan*, 399 F.3d at 1261.

## IV.   Plaintiff's Age, Education, Work Experience, and Medical History; and the ALJ's Decision

Plaintiff is a 48-year old divorced mother with two minor children, who has a long history of psychiatric difficulties.   She was 41 on May 30, 2008, the amended onset of disability date. [*Doc. 15-4* at 22, 25].   Plaintiff graduated from high school and completed three years of college at the University of New Mexico, studying environmental design.   *Id*. at 25.   Prior to her alleged disability, Plaintiff had worked as a teacher's aide, sales clerk, account manager, and credit representative.   [*Doc. 15-9* at 29].   Plaintiff has been diagnosed with both bipolar affective disorder and PTSD.   *See, e.g.,* [*Doc. 15-15* at 34].

> People with bipolar disorder experience unusually intense emotional states that occur in distinct periods called "mood episodes." Each mood episode represents a drastic change from a person's usual mood and behavior. An overly joyful or overexcited state is called a manic episode, and an extremely sad or hopeless state is called a depressive episode. Sometimes, a mood episode includes symptoms of both mania and depression. This is called a mixed state. People with bipolar disorder also may be explosive and irritable during a mood episode. Extreme changes in energy, activity, sleep, and behavior go along with these changes in mood.

Nat'l Inst. of Mental Health, "Bipolar Disorder in Adults," http://www.nimh.nih.gov/health/topics/bipolar-disorder/index.shtml#part_145404     (site last visited March 1, 2016).

Plaintiff's medical records include:  mental work capacity evaluation by her treating psychiatrist, Karl Mobbs, M.D., dated June 15, 2011 (*Doc. 15-16* at 54-57); mental RFC assessment (*id*. at 40-43) and psychiatric review technique (*id*. at 26-39), by Richard Reed, Ph.D., each dated March, 30, 2011; case analysis dated May 30, 2011 by Charles Mellon, M.D. (*id*. at 48); and psychiatric treatment records from the University of New Mexico Mental Health Center, dated October 10, 2008 through July 9, 2012 (*Doc. 15-21* at 21 through *Doc. 15-24* at 8), and dated February 4, 2011 through May 31, 2013 (*Doc. 15-28* at 2 through *Doc. 15-29* at 13). Where relevant, Plaintiff's medical records are discussed in more detail below.

At step one of the five-step evaluation process the ALJ found that Plaintiff "has not definitively engaged in substantial gainful activity" since her alleged disability onset date of May 30, 2008.[3]   [*Doc. 15-4* at 7].   At step two, the ALJ found that Plaintiff has the following severe medically determinable impairments:  bipolar disorder and PTSD.   *Id.* at 8.   At the third step, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled any of the Listings found in 20 C.F.R. § 404, Subpt. P, Appx. 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).   *Id.* at 9. The ALJ also found that Plaintiff had mild restriction of her activities of daily living, moderate difficulties with social functioning, and moderate difficulties with concentration, persistence or

---

[3] The ALJ considered Plaintiff's work in 2010 as a home health aide, which Plaintiff asserted was "an unsuccessful work attempt."   *See* [*Doc. 15-4* at 7].   However, based on "discrepancies" in Plaintiff's explanation of why she had stopped working at that job, the ALJ stated that she could not "without question, determine whether or not this was an unsuccessful work attempt" (*id*. at 8), and therefore continued with the sequential evaluation process.

pace.  *Id*. at 9-10.   In so finding, the ALJ found that "the opinions of state agency physicians" to

that effect were "well-reasoned and supported by the evidence of record."  *Id*.  Finally, the ALJ

determined that Plaintiff's mental impairments did not satisfy either the paragraph B or

paragraph C criteria of Listings 12.04 and 12.06.  *Id*. at 10.

> Before step four, the ALJ determined that Plaintiff had the RFC:
>
> [T]o perform "a full range of work at all exertional levels but with the following
> nonexertional limitations:  Due to a combination of mental impairments, the
> [Plaintiff] is limited to understanding, remembering, and carrying out simple
> instructions.  She is able to maintain attention and concentration to perform only
> simple tasks for two hours at a time without requiring redirection to task.  She
> should have only occasional contact with the general public.

[*Doc. 15-4* at 11].   In support of her RFC assessment, the ALJ found that "[Plaintiff]'s medically

determinable impairments could reasonably be expected to cause the alleged symptoms; however,

[her] statements concerning the intensity, persistence and limiting effects of these symptoms are

not entirely credible."  *Id*. at 12.   The ALJ also found that Plaintiff had experienced one episode

of decompensation of extended duration in 2008, after Plaintiff had been involved in a rollover car

accident.  *Id*. at 10.

At the fifth and final step, the ALJ noted that Plaintiff was born on February 19, 1967.

[*Doc. 15-4* at 15].   Therefore, Plaintiff was 41 years old on the amended disability onset date,

which is considered to be a "younger person."[4]  *Id.*   The ALJ noted that Plaintiff has at least a

---

[4] The ALJ found that Plaintiff was 38 years old "on the alleged disability onset date," (*Doc. 15-4* at 15), which was true with respect to her initially claimed onset date of November 1, 2005, but not as to her amended onset date of May 30, 2008.  *See Id*. at 23.   This is not a significant error, however, as both ages fall within the "younger person" category.   *See* 20 C.F.R. 404.1563(c) and 416.963(c) (defining a "younger person" as "under age 50").

high school education and is able to communicate in English, and stated that "[t]ransferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the [Plaintiff] is 'not disabled,' whether or not [she] has transferable job skills."   *Id*.   However, the ALJ noted that Plaintiff's ability to work at all exertional levels had been compromised by her non-exertional limitations, and that the VE had been asked to determine "whether jobs exist in the national economy for an individual with the [Plaintiff]'s age, education, work experience, and [RFC]."   *Id*. at 16.   The VE testified that such an individual "would be able to perform the requirements of representative occupations," including hand packer (DOT[5] 920.587-018), laundry worker (DOT 361.684-014), or hay sorter (DOT 732.686-010), all of which are "medium, unskilled work," or garment sorter (DOT 222.687-014),     assembly     worker     (DOT 706.684-022),     or     cannery     worker (DOT 529.686-014), all of which are "light, unskilled work."   *Id*.   Based on the VE's testimony, and considering Plaintiff's age, education, work experience, and RFC, the ALJ found that jobs exist in significant numbers in the national economy that Plaintiff can perform.   *Id.* at 15.   The ALJ stated that she "ha[d] determined that the [VE]'s testimony is consistent with the information contained in the [DOT]," and concluded that Plaintiff 'is capable of making a successful adjustment to other work that exists in significant numbers in the national economy."   *Id.* at 16.

---

[5] "DOT" stands for Dictionary of Occupational Titles.

The ALJ, therefore, determined that Plaintiff was not disabled within the meaning of the Social Security Act from November 1, 2005[6] to the date of the decision.   *Id.* at 17.

## V.   Analysis

Plaintiff makes the following arguments in her motion to reverse or remand: (1) the ALJ failed to properly consider the opinions of Plaintiff's treating psychiatrist, Karl Mobbs, M.D., in accordance with the treating physician rule; and (2) the ALJ failed to account for moderate nonexertional limitations indicated by state non-examining doctors, Richard Reed, Ph.D. and Charles Mellon, M.D., in her RFC narrative.   [*Doc. 21* at 1].   In response, Defendant contends that the ALJ properly evaluated the medical opinions, and her decision is supported by substantial evidence.   [*Doc. 25* at 10-13].   Plaintiff's reply reiterates that Dr. Mobbs' mental RFC of Plaintiff was consistent with the medical evidence, and that the limitations Dr. Reed found in Section I of his mental RFC of the Plaintiff should have been discussed, both by him and by the ALJ.   [*Doc. 26*].

### A.   The ALJ's Consideration of the Opinions of Dr. Mobbs

Plaintiff first contends that the ALJ's disregard of the opinions of Dr. Mobbs violated the "treating physician rule."   The ALJ must base the RFC assessment on all of the relevant evidence in the record, such as medical history, laboratory findings, effects of treatment and symptoms, including pain, reports of daily activities, lay evidence, recorded observations, medical source statements, evidence from attempts to work, need for a structured living environment, and work

---

[6] Again, this onset date was amended at the hearing, to May 30, 2008.   *See* n.4, *supra*.

evaluations, if any.   Soc. Sec. Rep. 96-8p at *5.   "The RFC assessment must include a narrative

discussion describing how the evidence supports each conclusion, citing specific medical facts

(e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)."   *Id.*

at *7.   The ALJ "must also explain how any material inconsistencies or ambiguities in the

evidence in the case record were considered and resolved," and the RFC assessment must always

consider and address medical source opinions.   *Id.*   Because the ALJ must consider the whole

record, she is prohibited from picking and choosing "among medical reports, using portions of

evidence favorable to [her] position while ignoring other evidence."   *Carpenter v. Astrue*,

537 F.3d 1264, 1265 (10th Cir. 2008) (citation and internal quotation marks omitted).   When

there are multiple opinions regarding medical severity and functional ability from different

sources, the ALJ must explain the weight given to each source's opinions.   *Hamlin*, 365 F.3d

at 1215 (citation omitted).

Here, the ALJ found that Plaintiff suffered from two severe disabilities; bipolar disorder

and PTSD.   Dr. Mobbs was Plaintiff's treating psychiatrist for ten months prior to assessing her

mental work functionality in June 2011.   *See* [*Doc. 15-16* at 54-57)].   As such, Dr. Mobbs is

considered a "treating source" whose opinions are generally given "controlling weight."   *See*

Soc. Sec. Rep. 96-2P, 1996 WL 374188 at *1 (1996) ("If a treating source's medical opinion is

well- supported and not inconsistent with the other substantial evidence in the case record, it must

be given controlling weight; i.e., it must be adopted").   The Tenth Circuit Court of Appeals has

explained this principle, which is commonly called the "treating physician rule," as follows:

> The treating physician's opinion is given particular weight because of his unique
> perspective to the medical evidence that cannot be obtained from the objective
> medical findings alone or from reports of individual examinations, such as
> consultative examinations or brief hospitalizations.   The opinion of an examining

> physician is generally entitled to less weight than that of a treating physician, *and the opinion of an agency physician who has never seen the claimant is entitled to the least weight of all*.

*Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004) (emphasis added) (citations and internal quotation marks omitted).  *See also Chapo v. Astrue*, 682 F.3d 1285, 1291 (10th Cir. 2012) (an examining medical-source opinion is given particular consideration and is presumptively entitled to more weight than a doctor's opinion derived from a review of the medical record).

Even where the ALJ determines that a treating source's opinion is not entitled to controlling weight, the opinion is still entitled to deference and must be weighed using the following factors:

> The [20 C.F.R.] § 404.1527 factors are:   (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*Bainbridge v. Colvin*, 618 F. App'x 384, 389-90 (10th Cir. 2015) (unpublished).   In this case, the only opinions regarding Plaintiff's mental functioning were provided by Dr. Mobbs, her treating

psychiatrist, Dr. Reed, a non-examining psychologist, and Dr. Mellon, a non-examining psychiatrist.[7]

On June 15, 2011, Dr. Mobbs filled out a mental work capacity evaluation (*Doc. 15-16* at 54-57), in which he expressed his opinion that Plaintiff had experienced repeated episodes of decompensation of extended duration within the previous year. *Id*. at 54. Dr. Mobbs also identified the following symptoms of bipolar disorder and PTSD from which Plaintiff suffered: anhedonia[8]; sleep disturbance; decreased energy; irritability; fatigue; persistent anxiety; appetite disturbance with change in weight; difficulty concentrating; difficulty making decisions; blunt, flat or inappropriate affect; mood disturbance; and emotional lability. *Id*. Dr. Mobbs also noted that Plaintiff was "highly educated and cognitively intact," and indicated that she had only a mild limitation of her ability to understand and remember detailed instructions. *Id*. at 55. He further indicated that Plaintiff had mild difficulty with her ability to carry out detailed instructions; moderate difficulty with her ability to carry out very short and simple instructions; maintain attention and concentration for two hours; sustain work-activities within a full-time schedule; and sustain an ordinary routine without special supervision; marked difficulty with her ability to

---

[7] Dr. Mellon's May 30, 2011 evaluation (*Doc. 15-16* at 4) was performed between the denial of Plaintiff's claims at the initial review level and the reconsideration level review, and is effectively only a review and affirmance of Dr. Reed's RFC assessment, taking into consideration some additional, subsequent medical records. Thus, while Dr. Mellon's analysis is certainly appropriate and relevant evidence that the ALJ was required to consider, it illustrates why non-examining consultative opinions are typically afforded the least amount of weight out of all of the medical opinions considered by an ALJ.

[8] Anhedonia is defined as an "[a]bsence of pleasure from the performance of acts that would ordinarily be pleasurable." Stedmans Medical Dictionary 42670 (2014).

function independently; make simple work-related decisions; and perform at a consistent pace without an unreasonable number and length of breaks; and extreme difficulty with her ability to: maintain regular attendance and be punctual within customary tolerances; and complete a normal workday and workweek without interruptions from psychologically-based symptoms.[9]  *Id.* at 55-57.   Dr. Mobbs noted that Plaintiff's "PTSD makes the work environment difficult to negotiate."  *Id.* at 56.   Dr. Mobbs similarly indicated that Plaintiff had mild, moderate, and marked difficulty with various aspects of social interaction.  *Id.*  With respect to Plaintiff's ability to adapt, Dr. Mobbs indicated that she had marked limitations in all four adaptation categories, stating that "[she] has PTSD [due to motor vehicle accident]; she is easily triggered by stress."  *Id.* at 57.   Finally, Dr. Mobbs indicated that Plaintiff had no substance abuse issues, that she was capable of managing her own benefits, but that she could not sustain any work activity for five days a week, eight hours a day, fifty-two weeks a year, noting that "severe PTSD limits [Plaintiff]'s social functioning."  *Id.*   In his assessment, Dr. Mobbs assigned to Plaintiff a Global

---

[9] Medical sources are instructed to check the "not significantly limited," box on the Mental RFC form "when the effects of the mental disorder do not prevent the individual [being evaluated] from consistently and usefully performing the activity;" the "moderately limited," box "when the evidence supports the conclusion that the individual's capacity to perform the activity is impaired;" and the "markedly limited" box "when the evidence supports the conclusion that the individual cannot usefully perform or sustain the activity."   POMS DI 24510.063.B.   The Social Security Administration's "Program Operations Manual System" ("POMS") may be viewed on the Social Security Administration website, at https://secure.ssa.gov/apps10/ (site last visited March 1, 2016).   POMS does not define "severely limited," as the official mental RFC form (SSA-4734-F4-SUP) does not include that as an option.

Assessment of Functioning (hereinafter "GAF")[10] score of 58, indicating also that 58 was the highest GAF score Plaintiff had been given in the previous year.   *Id.* at 54.

The ALJ did not specifically assign a weight to Dr. Mobbs' opinions, nor did she discuss the 20 C.F.R. § 404.1527 weighting factors.   She did, however, determine that Dr. Mobbs' "assessment is not consistent with the overall evidence of record, his treatment records, and does not reflect moderate symptoms as suggested by the [GAF] score he afforded."   [*Doc. 15-4* at 14]. The ALJ went on to find that the opinions of the state agency doctors, Reed and Mellon, were "more consistent with the record as a whole" than was Dr. Mobbs' opinion, and gave the opinions of those non-examining doctors "more weight than [she gave] to the opinion of Dr. Mobbs."   *Id.* In reaching this decision, the ALJ focused on only two perceived issues with Dr. Mobbs' assessment, consisting of a single minor internal inconsistency within the assessment itself, and Plaintiff's GAF score.   Indeed, the ALJ appeared to consider the GAF scores assigned to Plaintiff over time to be by far the best evidence of the providers' assessment of Plaintiff's ability to function in a work environment.   However, this approach to weighing medical evidence has been rejected by the Tenth Circuit.   *See Groberg v. Astrue*, 415 F. App'x 65, 69 (10th Cir. 2011) (unpublished) (an ALJ's "naked reliance on the GAF score" ignores the source's narrative progress notes).   Thus, "[a] single 'good day' at the doctor's office does not necessarily signify the lack of

---

[10] The GAF score is a measurement of the clinician's judgment of an individual's psychological, social and occupational functioning, and should not include impairment in functioning due to physical or environmental limitations.   DSM-IV-TR at 32.   A GAF score between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumlocutory speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).   *Id.* at 34.

any occupational effects from mental disorders." *Groberg v. Astrue*, 505 F. App'x 763, 769 (10th Cir. 2012) (unpublished).

Here, the ALJ acknowledged the fluidity of Plaintiff's GAF scores over time, but attributed the fluctuation of her scores to Plaintiff's own failure to take her medication. *See, e.g.,* [*Doc. 15-4* at 13] (noting that Plaintiff's low GAF scores "were assessed during psychiatric hospitalizations and episodes of mania" and "clearly demonstrate[] that the [Plaintiff] exhibits tendencies to get on and off her medications"). This is but one of many sweeping generalizations the ALJ made with respect to both Plaintiff's medical records and her "actual" day-to-day functionality. Such statements are without reference to the record and are generally in the nature of opinions. Such statements also fail to account for the inherently fluctuating functionality of someone who has been diagnosed with bipolar disorder. However, the ALJ's job is to collect, review, and analyze the medical evidence before her, not to act as a consulting medical source.[11] In any event, between September 2008 and May 2013, Plaintiff was assigned a GAF score by her treating medical providers at least 40 times, which range from a low of 30 to a high of 60, and average slightly less than 47.[12] Thus, of the myriad of treating medical sources who examined Plaintiff,

---

[11] Medical opinions are expected to be provided by those trained in the medical field, not by ALJs. *See, e.g., Kemp v. Bowen*, 816 F.2d 1469, 1476 (10th Cir. 1987) ("While the ALJ is authorized to make a final decision concerning disability, [s]he can not interpose [her] own 'medical expertise' over that of a physician, especially when that physician is the regular treating doctor for the disability applicant") (citations omitted). *See also Bolan v. Barnhart,* 212 F.Supp.2d 1248, 1262 (D. Kan. 2002) ("The ALJ's duty is to weigh conflicting evidence and make disability determinations; [s]he is not in a position to render a medical judgment") (citations omitted).

[12] Plaintiff's GAF scores, by date and provider were:   **September 2008**:   9/2: GAF 30 - Young, M.D. (Doc. 15-13 at 29); 9/3: GAF 30 - Thyagaraj, M.D. (Doc. 15-13 at 29); 9/4: GAF 30 - Thyagaraj, M.D. (Doc. 15-22 at 41);
        Continued...

Dr. Mobbs actually gave her the highest GAF score.   However, as the Tenth Circuit has noted, a GAF score's effect on functional abilities must be explained by the provider, and "[t]he most recent edition of the DSM omits the GAF scale" for reasons that include "its conceptual lack of clarity . . . and questionable psychometrics in routine practice."   *Richards v. Colvin*, No. 15-6121, 2016 WL 556745, at *4 (10th Cir. Feb. 12, 2016) (although GAF score may be of considerable help to the ALJ in formulating the RFC, it is not essential to the RFC's accuracy).   While the ALJ may believe that a GAF score of 58 on any given day is "inconsistent" with the moderate, marked, and severe functionality limits detailed by Dr. Mobbs, that alone is hardly a sufficient basis upon which to disregard all of his assessments, nor does it render those assessments "inconsistent with his treatment records."

---

9/5: GAF 30 - Thyagaraj, M.D. (Doc. 15-22 at 38); 9/6: GAF 30 - Kodis, M.D. (Doc. 15-22 at 36); 9/8: GAF 30 - Thyagaraj, M.D. (Doc. 15-22 at 31); 9/9: GAF 30 - Thyagaraj, M.D. (Doc. 15-22 at 26); 9/10: GAF 30 - Thyagaraj, M.D. (Doc. 15-22 at 21); 9/11: GAF 30 - Thyagaraj, M.D. (Doc. 15-13 at 62); 9/12: GAF 45 - Thyagaraj, M.D. (Doc. 15-13 at 36); **October 2008**: GAF 55 - Diaz, M.D. (Doc. 15-15 at 62); **November 2008**: 11/3: GAF 42 - Abrams, M.D. (Doc. 15-13 at 23);11/11: GAF 55 - Diaz, M.D. (Doc. 15-15 at 58); **December 2008**: GAF 60 - Diaz, M.D. (Doc. 15-15 at 55); **March 2009**: GAF 55 - Diaz, M.D. (Doc. 15-15 at 52); **May 2009**: GAF 55 - Diaz, M.D. (Doc. 15-15 at 49); **July 2009**: GAF 50 - Khafaja, M.D. (Doc. 15-15 at 46); **November 2009**: GAF 40 - Khafaja, M.D. (Doc. 15-15 at 44); **December 2009**: GAF 42 - Khafaja, M.D. (Doc. 15-15 at 40); **January 2010**: GAF 40 - Khafaja, M.D. (Doc. 15-15 at 38); **June 2010**: GAF 50 - Khafaja, M.D. (Doc. 15-15 at 34); **August 2010**: GAF 55 - Mobbs, M.D. (Doc. 15-15 at 31); **September 2010**: GAF 55 - Mobbs, M.D. (Doc. 15-13 at 33); **February 2011**: GAF 55 - Mobbs, M.D. (Doc. 15-23 at 24); **March 2011**: GAF 58 - Mobbs, M.D. (Doc. 15-16 at 58); **June 2011**: 6/15: GAF 58 - Mobbs, M.D. (Doc. 15-16 at 54); 6/30: GAF 50 - Stoll, C.N.P. (Doc. 15-23 at 18); **July 2011**: GAF 50 - Deetz, C.N.P. (Doc. 15-23 at 16); **September 2011**: GAF 58 - Dixon, C.N.P. (Doc. 15-23 at 12); **April 2012**: GAF 45 - Stoll, C.N.P. (Doc. 15-23 at 10); **May 2012**: GAF 55 - Prieto, M.D. (Doc. 15-22 at 6); **June 2012**: GAF 55 - Prieto, M.D. (Doc. 15-22 at 56); **July 2012**: GAF 55 - Yutzy, C.P.N. (Doc. 15-22 at 54); **August 2012**: GAF 60 - Yutzy, C.P.N. (Doc. 15-22 at 51); **September 2012**: GAF 60 - Yutzy, C.P.N. (Doc. 15-28 at 20); **November 2012**: GAF 48 - Yutzy, C.P.N. (Doc. 15-28 at 17); **December 2012**: GAF 48 - Yutzy, C.P.N. (Doc. 15-28 at 15); **March 2013**: GAF 48 - Yutzy, C.P.N. (Doc. 15-29 at 9); **April 2013**: GAF 50 - Yutzy, C.P.N. (Doc. 15-29 at 7); **May 2013**: GAF 55 - Yutzy, C.P.N. (Doc. 15-29 at 3).  Plaintiff's average GAF score of 47 falls within the range of 41-50, and indicates "[s]erious symptoms" such as "suicidal ideation, severe obsessional rituals, [or] frequent shoplifting," or "serious impairment in social occupational or school functioning (e.g., no friends, unable to keep a job)."  DSM-IV-TR at 34.  Plaintiff's lowest score of 30, which was assessed during a hospitalization, is within the range of 21-30, which indicates that "[b]ehavior is considerably influenced by delusions or hallucinations or serious impairment, in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) or inability to function in almost all areas (e.g., stays in bed all day, no job, home, or friends)."  *Id.*

The ALJ also noted that Dr. Mobbs had checked "mild" with respect to Plaintiff's ability to carry out detailed instructions, while checking "moderate" with respect to her ability to carry out short, simple instructions.   *See* [*Doc. 15-4* at 14].   However, this apparent minor inconsistency may be wholly eliminated from Dr. Mobbs' opinion without in any way detracting from the opinion's impact, which is that Plaintiff has many moderate, marked, and even severe functional limitations.   Specifically, if the two assessments regarding ability to carry out instructions are removed from the assessment, Dr. Mobbs' opinion would still indicate that Plaintiff has two moderate and one extreme limitation within the same category of "Sustained Concentration and Persistence."   [*Doc. 15-16* at 55].   Dr. Mobbs' assessment form includes four function categories that contain a total of 26 rated abilities.   Out of the 24 remaining abilities, Plaintiff was assessed with "extreme" limitations in 3, "marked" limitations in 11, "moderate" limitations in 5, and "none" or "mild" in 5.   *Id*. at 55-57.   An apparent mix-up of two abilities (with ratings of mild and moderate, in any event), simply cannot justify disregarding the other 24 assessments, even when combined with what the ALJ deemed to be an "inconsistent" GAF score.[13]

---

[13] Inexplicably, the ALJ stated in her decision that she had reviewed multiple records from Plaintiff's treating physicians, but that there was "no evidence to suggest that any of [them] were of the opinion that the [Plaintiff] was not able to perform work as defined in the residual functional capacity determined in this decision."   [*Doc. 15-4* at 13]. Inasmuch as Dr. Mobbs specifically stated, among other things, that Plaintiff had "severe" limitations with respect to her ability to both "maintain regular attendance and be punctual within customary tolerances," and "complete a normal workday and workweek without interruptions from psychologically based symptoms" (*Doc. 15-16* at 55-56), and the VE testified that a person who missed work more than once a month on a regular basis would not be able to maintain competitive employment (*Doc. 15-4* at 51-52), it is hard to imagine how the ALJ could come to such a conclusion.

Dr. Mobbs' assessment of Plaintiff's work functionality was based on his extensive interaction with Plaintiff, his years of practice as a psychiatrist, and his unique position as a member of a team of mental health providers who had, for years, treated Plaintiff under vastly varying life circumstances.   The ALJ's decision to simply disregard Dr. Mobbs' opinion in its entirety is not in any way supportable by the minimal and general factors she stated for doing so. Rejection of the only mental assessment provided by a treating specialist cannot be founded on global generalizations to the effect that his opinion is "not consistent with the overall evidence of record [and] his treatment records."   If there are indeed actual conflicts between Dr. Mobbs' opinion and the voluminous mental health records that document Plaintiff's treatment at the University of New Mexico Mental Health Center, then the ALJ should certainly have discussed them in her decision.   The fact that she did not is grounds for remand.[14]   If, on the other hand, Dr. Mobbs' opinion conflicts only with the opinions of the consultative, non-examining doctors, that is also an insufficient basis upon which to disregard a treating specialist's opinion, and therefore also warrants remand.

---

[14] Defendant's citation to the medical evidence of record in support of the ALJ's findings is simply impermissible *post hoc* rationalization, as well as an example of the very type of "picking and choosing" in which ALJ's are prohibited from engaging.   *See Haga v. Astrue*, 482 F.3d 1205, 1207-08 (10th Cir. 2007) ("court may not create or adopt post-hoc rationalizations to support the ALJ's decision that are not apparent from the ALJ's decision itself"); *Carpenter*, 537 F.3d at 1265 (decision makers may not pick and choose evidence that supports their decision). If the ALJ did, in fact, rely on the medical records cited in Defendant's appellate brief, she should have stated that herself, as well as discussing any evidence that is in conflict with them.   An ALJ's findings of fact must be tied to the evidence by the ALJ, and *post hoc* citations to the record in support of those facts is not permissible.   *See, e.g., Allen v. Barnhart*, 357 F.3d 1140, 1145 (10th Cir. 2004) (if harmless error rests on matters not considered by the ALJ, it risks violating the proscription against post hoc justification).

## B.   The ALJ's Consideration of the Opinions of Dr. Reed[15]

Plaintiff also contends that the ALJ failed to properly include certain elements of the opinions of the state agency consultative doctors when she endorsed their opinions.  As already noted, an RFC assessment must be based on all of the relevant evidence in the record, and must include a narrative discussion describing how the evidence supports each conclusion. Soc. Sec. Rep. 96-8p at *5-7.   The RFC assessment "must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved," and must always consider and address medical source opinions.  *Id.*   Because the whole record must be considered, the decision maker is prohibited from picking and choosing "among medical reports, using portions of evidence favorable to his position while ignoring other evidence." *Carpenter*, 537 F.3d at 1265 (citation and internal quotation marks omitted).

On March 30, 2011, Dr. Richard Reed, a psychologist, completed a mental RFC assessment of Plaintiff, based on a review of her medical records.   [*Doc. 15-16* at 40-43]. Similar to the assessment provided by Dr. Mobbs, Dr. Reed's assessment form contained four categories in Section I:   Understanding and Memory; Sustained Concentration and Persistence; Social Interaction; and Adaptation.   Dr. Reed's form contained twenty listed abilities to be assessed in Section I and, of those twenty, Dr. Reed indicated that Plaintiff was "moderately limited" in nine of them.   Among the abilities in which Dr. Reed indicated Plaintiff had moderate

---

[15] As already discussed, Dr. Charles Mellon's opinion is essentially an endorsement of Dr. Reed's opinion and, therefore, will not be separately addressed in this decision.

limitations were the ability to "perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances" (*id*. at 40); to "complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods" (*id*. at 41); to "ask simple questions or request assistance;" (*id*.) and to "maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness" (*id*.).    In Section III, however, Dr. Reed's assessment indicated only that "[a]ssuming that the [Plaintiff] remains treatment compliant with her medications and follows through with her appointments, she is belived [sic] capable of the following:   [Plaintiff] can understand, remember and carry out detailed but not complex work."[16] *Id*. at 42.

In response to Plaintiff's motion to remand, Defendant argues that the ALJ did not err by failing to include Dr. Reed's moderate limitations in her RFC because the Tenth Circuit does not require her to do so, citing *Carver v. Colvin*, 600 F. App'x 616 (10th Cir. 2015) (unpublished). [*Doc. 25* at 11-12].   As Defendant points out, *Carver* states, relying on the Social Security Administration's Program Operations Manual Systems (hereinafter "POMS"), that "[t]he purpose

---

[16] This statement is effectively Dr. Reed's entire "narrative."   Although he referred to his Psychiatric Review Technique (*Doc. 15-16* at 26-38) "for narrative" (*id*. at 42), that narrative consists nearly entirely of Dr. Reed's summarization of the medical records he reviewed, after which he stated that "[Plaintiff] has seen good response to medication but is inconsistent in her participation in her treatment, going months between contacts with providers.   She continues to experience some [mental health symptoms].   [Plaintiff] has moderate limitations with social interactions."   *Id*. at 38.   Significantly, in a previous section of the Psychiatric Review Technique document, Dr. Reed indicated that Plaintiff also had moderate limitations in "Maintaining Concentration, Persistence, or Pace," and had experienced "One or Two Episodes of Decompensation, Each of Extended Duration" (*id*. at 36), yet he failed even to mention those assessments in either of his narratives.

of [S]ection I [of the mental RFC form]. . . is chiefly to have a worksheet to ensure that the psychiatrist or psychologist has considered each of these pertinent mental activities and the [Plaintiff]'s degree of limitation . . . **It is the narrative** written by the psychiatrist or psychologist in Section III . . . **that adjudicators are to use as the assessment of RFC**." *Carver*, 600 F. App'x at 619 (unpublished) (citing POMS DI 25020.010 B.1). However, the *Carver* decision qualifies that statement, as follows:

> But this does not mean that an ALJ can turn a blind eye to moderate Section I limitations. In a note to its description of the "moderately limited" checkbox, the POMS states that "[t]he degree and extent of the capacity or limitation *must be described* in narrative format in Section III [of the MRFCA]." The POMS also provides that "[t]he **discussion** of all mental capacities and limitations in [Section III] **must be in narrative format**," and that Section III is for "explaining the conclusions indicated in [S]ection I, in terms of the extent to which these mental capacities or functions could or could not be performed in work settings." Thus, *if a consultant's Section III narrative fails to describe the effect that each of the Section I moderate limitations would have on the claimant's ability, or if it contradicts limitations marked in Section I, the MRFCA cannot properly be considered part of the substantial evidence supporting an ALJ's RFC finding.* Several district courts in this circuit have reached a similar conclusion based on reasoning we consider persuasive.

*Id.* (citations omitted) (some emphasis added). Thus, Dr. Reed should have discussed in his narrative *all of the limitations he found Plaintiff to have in Section I*, and the ALJ should likewise have discussed those limitations in connection with her evaluation of the medical evidence. As this was not the case, Dr. Reed's opinion cannot properly be considered substantial evidence that supports the ALJ's decision. Moreover, failure to fully account for all of Plaintiff's limitations leaves a significant gap in the ALJ's assessment of Plaintiff's work-related abilities, which requires a remand of this case for further consideration.

## VI.   Conclusion

For the reasons stated above, the Court **FINDS** that the Commissioner's decision should be remanded for further proceedings, including proper consideration of the opinions of Drs. Mobb, Reed, and Mellon.

**IT IS THEREFORE ORDERED** that Plaintiff's ***Motion to Reverse and Remand for a Rehearing With Supporting Memorandum*** *(Doc. 21)* is **GRANTED** and this case is **REMANDED** to the Commissioner for further proceedings consistent with this Memorandum Opinion and Order.   A final order will be entered concurrently with this Memorandum Opinion and Order.

**IT IS SO ORDERED.**

_Lourdes A. Martínez_

**LOURDES A. MARTÍNEZ**
**UNITED STATES MAGISTRATE JUDGE**
**Presiding by Consent**